[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In the instant case, the plaintiff seeks to recover damages for breach of a contract. According to the complaint, the plaintiff and the defendant Mark Winchell entered into an agreement on or about September 17, 1992 whereby the plaintiff furnished materials and labor in connection with the installation of a new septic system on a lot owned by the defendants in Middlefield. A motion made just before trial to add a second count in quantum meruit was denied.
On their part the defendants admit the existence of a contract but deny that it was solely for the installation of a septic system. In addition, the defendants have asserted three special defenses and a counterclaim. The special defenses allege that the material and/or services provided by the plaintiff were defective, unsuitable and/or not to their satisfaction; the plaintiff failed to perform the work adequately and the plaintiff did not complete the work nor provide all of the materials required by the agreement.
The counterclaim recites that pursuant to an oral contract entered into on or about September 17, 1992, the plaintiff was to provide, in addition to other items, a complete septic system, stones for a driveway and cellar floor, footing drains, excavate and back fill the foundation hole, and rough grade and spread topsoil. According to the counterclaim, the contract was breached in one or more of the following ways: the plaintiff failed to perform the work and furnish the materials set forth in the CT Page 5123-ZZZ contract completely and properly; the plaintiff used topsoil belonging to the defendant; the work performed by the plaintiff and the materials furnished by him were not of good workmanship or quality and not fit for the purposes intended; and the plaintiff failed to perform his duties in a skillful, competent and workmanlike manner. The defendants claim that these defaults have caused them to sustain monetary damages.
 I.
Evidence at the trial was both testimonial and documentary. From it and including reasonable inferences, the court finds the facts set forth below.
The plaintiff and the defendant Mark Winchell knew each other before entering into the contract at issue. Mark Winchell solicited the plaintiff to do the excavating, septic system and driveway at the defendant's new home site in Middlefield. In response, the plaintiff telephoned Mark Winchell and read to him a list of items that at the time or subsequently were embodied in a written proposal. The plaintiff also quoted prices. The defendants wanted the plaintiff to get started right away. Although the written proposal is dated August 31, 1992, it was delivered to Mark Winchell at the job site about three weeks after the plaintiff began to work.
The proposal was on a printed form. Included in the printed language was "We hereby propose to furnish all the materials and perform all the labor necessary for the completion of". Below these words the plaintiff, in the space provided wrote:
 Dig Backfill Foundation (1 day of pushing fill) around house and garage
 Put stone inside plus Footing drain to drain water out
 Stripping of all topsoil from Septic System and House
Digging of Electrical Line
Digging of Well Line CT Page 5123-AAAA
 Installation of Septic System complete
Process driveway (No paved apron)
 Spreading all topsoil back on lot
Extras (If more than one
 ((day pushing fill (will be additional cost of
(($500.00 per day for Machines
(Rain gutters pipe will be
 (( (an additional cost of $400
 (( (if wanted installed
Other printing on the form stated that "all material is guaranteed as specified and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of". In the blank space reserved for the amount, the plaintiff wrote $8,800.00 and in the additional space for terms of payment he inserted "Pay as we go along what I do and installed (sic) I get paid."
The proposal was signed by the plaintiff. It was not signed by either of the defendants. When it was delivered, however, the defendants did not raise any objection to its provisions.
Much of the controversy concerns the installation of the septic system and the amount of fill or topsoil used to cover it. The septic system was designed for the defendants by Frank Magnatta a licensed civil engineer in Durham. Magnatta had plotted road and lot lines and drawn plans for other septic systems in the subdivision where the defendants' lot is located.[1] For vertical elevations, Magnatta had used a bench mark at 218.00 feet designated by a pipe located on Strickland Road, the subdivision's southerly boundary. CT Page 5123-BBBB
Later, but before construction of the defendants' septic system had begun, Magnatta saw that his benchmark pipe had been disturbed. He pulled the pipe out and transferred his vertical elevation marker to a new and comparable bench mark that he placed on the foundation of the defendant's house.
Before submitting the design of the proposed septic system to the Middlefield sanitarian for approval, Frank Magnatta had three test holes dug as part of the required procedure. None of the holes showed evidence of ledge. To satisfy Alex Cinotti, Middlefield's new sanitarian, Magnatta had two additional holes dug that were designated on the survey map as TH "A" and "B". Ledge was found at TH "A". Any leaching lines are required to be four feet above ledgetop.
When the contract was entered into, the plaintiff did not have a subsurface license so he engaged Donald Catrona to obtain the necessary permit and to install the septic system. Catrona previously had constructed from 75 to 100 such systems. The plaintiff gave Frank Magnatta's engineering drawings to Catrona. Also Catrona was present when Magnatta established his new elevation bench mark and he adhered to it in performing his work. It took Catrona one and one-half days to install the septic system. Apparently he did some other work under the contract.
In October, 1992, when the septic system was finished but open to view it was inspected by Alex Cinotti in the presence of the plaintiff, Frank Magnatta, Donald Catrona and the defendant Mark Winchell. In approving the plan for the system, Cinotti had specified that eight inches of soil were to be put over four inch perforated sewer pipe so that from the bottom of the pipe there would be twelve inches of soil. The inspection was visual with the engineer shooting elevations from his transit. Cinotti approved the installed system as being in compliance with Magnatta's original survey map, his own requirements, and the Public Health Code. He issued a certificate of occupancy. Pursuant to the Public Health Code, the eight inches of covering soil had to be put over the sewer pipes within twenty-four hours after final approval.
Mark Winchell was unhappy with Cinotti's approval. Winchell felt that Magnatta's elevations were based upon his original and subsequently disturbed bench mark which, when combined with the ledge, meant that the septic system had not been installed sufficiently below grade level. Winchell told the plaintiff to CT Page 5123-CCCC install the septic system eight inches below grade or do nothing further under the contract. Winchell's testimony was that he told the plaintiff that a coverage of sixteen inches would be required and that the defendants' topsoil was not to be used. The plaintiff testified that the defendants said they did not want him to use their fill but said nothing about topsoil. On returning to the site two days later, the defendants discovered that the septic system had not been lowered and had been covered with their topsoil. Mark Winchell then told the plaintiff to "stay off" the defendants' property.
As the engineer, Frank Magnatta was supposed to provide the defendants with a survey map showing the septic system "as built" and give a copy to the town. Almost a year elapsed before the "as built" map was distributed. Magnatta refused to release it until the defendants paid his fee. Some of the dimensions in the leaching lines on the "as built" map were shorter by one-tenth of a foot from the comparable lines on Magnatta's original map. At the trial, Alex Cinotti testified that the deviations were professionally acceptable.
The defendant's lot is steep in front. Mark Winchell testified that he and the plaintiff had agreed that the defendants would provide additional fill for the front yard and all other material would be supplied by the plaintiff. Winchell claimed that this meant to him that the plaintiff would furnish the topsoil necessary to cover the septic system.
Before the contract was made, there was a large pile of topsoil on the lot that had been left by the road builder. When the plaintiff, or Catrona acting for him, stripped away the topsoil around the foundation and in the area where the septic system was to go they added to the pile and subsequently took from it to cover the septic system after final approval. Mark Winchell stated that the defendants planned to use all of the topsoil on their front and side yards and none in the back where the septic system was located.
The defendants claim that when final approval was given, the septic system was eight to nine inches above the ground. Also they report that the septic system emits an odor that they are afraid to report to the Middlefield sanitarian and have not had otherwise checked for cause. Grass in the backyard over the septic system becomes discolored but aside from additional topsoil, the defendants have done nothing to their backyard since October, 1992. CT Page 5123-DDDD The backyard of the defendants' lot, like the front yard slopes away. The backyard slope, however, is more gradual.
Expenses incurred by the defendants that are claimed to be attributable to the plaintiff's breach or nonperformance of the contract are $1144.00 paid to Gary Pederson for excavating; $4590.00 paid to Richard Westfort for fill; $2560.00 paid to Tayco Corporation, of which $1500.00 was for bringing topsoil into rear yard and spreading it and $1060.00 for finish grading to front and side yards, topsoil and stone for driveway; $353.24 to Tilcon Company for stone for driveway; $1791.40 to Charles W. Wimler for fill for front yard that the plaintiff is claimed to have agreed to purchase; $1632.00 again to Tayco Corporation for stone for garage floor and for topsoil delivered and spread in front yard. The total of the defendants claimed expenses is $12,070.64.
The plaintiff's contention is that the contract was substantially performed before Mark Winchell told him to stay away/[.] According to the plaintiff the only items remaining were digging the electric and well lines, the grading of one side of the house, and the grading and placing of process stone in the driveway. According to the plaintiff, the unfinished work should cost $1250.00 and take no more than one and one-half days to complete. For damages the plaintiff requests the basic contract amount of $8,800.00 plus extras of $400.00 for installation of leader drains (rain gutters), $300.00 for five hours of moving topsoil to the front of the house, $360.00 for six hours of pushing and pulling concrete trucks that had gotten stuck and $300.00 for 5 hours of pushing fill around to the front of the house and to build up the driveway. From the total sum of $10,160.00 the plaintiff has subtracted $1250.00 for the unfinished work leaving an amount to be recovered of $8910.00.
Certain statements contradictory to the plaintiff's claims were made by him in a prior deposition. The defendants who have not paid anything to the plaintiff, also have engaged in conduct that indicates an understanding that some liability exists. On a Sunday Mark Winchell went to the plaintiffs house and offered $4,000.00 in full payment. These admissive incidents as well as some further findings of fact will be discussed in the next section of this memorandum.
 II.
Although the existence of the contract has been admitted, the CT Page 5123-EEEE plaintiff still must prove the terms of the contract and that he has substantially performed his obligations under the contract in order to gain a recovery. "What the parties intended to encompass in their contractual commitments is a question of the intention of the parties and an inference of fact." Gallicchio Bros., Inc. v. C S Oil Co., 191 Conn. 104, 107 (1983). Since an inference of fact is involved, the court's findings cannot be set aside unless they are clearly erroneous. Coelho v. Posi-Seal International, Inc.,208 Conn. 106, 113 (1988); Gallicchio Bros., Inc. v. C S Oil Co.,supra.
From the testimony of Mark Winchell alone the court is able to find that performance of the items in the plaintiff's written proposal not labeled as extras had been agreed to by both parties. Mark Winchell testified that the total price he was supposed to pay was $9,200.00, being $8,800.00 for the basic contract and $400.00 for the rain gutters or leaders if installed. This finding, however, does not answer the principal question which, from the pleadings and evidence, seems to be whether the language in the plaintiff's proposal that he would "furnish all the materials . . . necessary for the completion of" [named items] required him to bring additional fill and top soil onto the defendants' lot.
The measure of a contract is the intent of the parties thereto. Monroe Ready Mix Concrete, Inc. v. Westcor DevelopmentCorp., 183 Conn. 348, 351-52 (1981); Village Line Corporation v.Children's Store, Inc., 31 Conn. App. 652, 655-56 (1993). In ascertaining the intent of the parties, the court should consider not only the contractual language but also the circumstances that surrounded the making of the contract, the motives of the parties and the purpose that they sought to accomplish. Barnard v.Barnard, 214 Conn. 99, 109 (1990). The steep grades of the lot and the language in the proposal that include digging for and backfilling of a foundation and the installation of a driveway have convinced the court that, when the contract was made, the parties intended the plaintiff's obligation to furnish material to include the providing of some fill.[2] Moreover the plaintiff did bring a quantity of fill onto the defendants' premises. An opposite conclusion, however, has reached regarding top soil.[3] In the plaintiff's proposal which the defendants accepted, he was to strip all top soil from the septic system and the house and to spread all top soil back on the lot. The clear inference is that only the top soil that was stripped was subsequently to be spread.[4]
Substantial performance is an equitable doctrine that has been CT Page 5123-FFFF crafted to avoid or to mitigate the harsh results of requiring full performance by contractors in the unique contexts presented by construction contracts. 19 COA 647, 686-87 ("Cause of Action for Breach of Contract for Construction or Repair of Residence"). If substantial performance is found, the contractor may recover the contract price minus the cost of repairing defects or completing unfinished work. 41 A.L.R.4th 131, 177-78 Anno. ("Damages — Breach of Construction Contract"). The purpose of the doctrine is to prevent the injustice of forfeiture by the contractor and unjust enrichment by the owner. Id. at 141. The contractor's burden is to show that despite some deviation from strict compliance with the terms of the contract, the owner received a structure that fulfilled the basic functions of structures of that generic type. 19 COA op. cit. at 689. American courts generally have found substantial performance to exist despite the existence of large numbers of defects in material and workmanship unless the structure is totally unfit for the purpose for which it was originally intended. 41 A.L.R.4th, op. cit. at 177.
Connecticut's adherence to the majority view is shown by decisions such as Argentinis v. Gould, 219 Conn. 151 (1991);Vincenzi v. Cerro, 186 Conn. 61 (1982) and Miller v. Bourgoin,28 Conn. App. 491 cert. denied 223 Conn. (1992). In Argentinis, supra
at 57, the court defined a builder's substantial performance a constructive condition of the owner's duty to pay. From Vincenzi,supra at 615-16, it becomes evident that the wilfulness of a contractor's breach is only one among many factors to be considered in determining whether there has been substantiality of performance. And in Miller, supra at 496, the court emphasized that whether a building contract has been substantially performed is a question of fact involving an inquiry into the totality of facts and circumstances surrounding performance.
In upholding a trial court's determination that substantial performance had occurred, the Supreme Court in Vincenzi v. Cerro,supra at 616 referred to 2 Restatement (Second), Contracts §§ 237 comment d and 241. A review of the cited portions of the Restatement language as well as the facts previously found leads to the conclusion that the contract at issue was substantially performed. The septic system, the principal source of complaint, is operative. Apparently the odor, if one exists, is not of a magnitude that requires an official complaint or promotes an investigation for cause. Further, the issuance of a certificate of occupancy is evidence of substantial performance although not, in and of itself, depositive of the question. Miller v. Bourgoin,CT Page 5123-GGGGsupra at 496.
Answers given by the plaintiff to questions asked at a pretrial deposition were placed in evidence as admissions by the defendants. The plaintiff's answers when reviewing plans for the septic system at the deposition were that the system had been raised eight inches. A statement more in line with the plaintiff's position at trial would have been that the system had to be filled eight inches. The plaintiff's answers were evidentiary admissions the weight of which depends upon surrounding circumstances. C. Tait, Handbook of Connecticut Evidence (2d ed) 332 (§ 11.5.2). In light of other evidence in the case, the court does not view the obviously erroneous deposition testimony as very important.
The difficulty with the evidence introduced in support of the defendants counterclaim is its relationship to the contract. Most of the defendant's expenditures were to bring in topsoil, an item that the court found was not within the contract, or fill the amount of which seems extraordinary when compared to what the plaintiff had contracted to do. Moreover the driveway installed by the defendants is stone rather than "process" the material called for in the contract. Mark Winchell's offer of $4,000.00 was not made during settlement negotiations and, as stated, was considered solely as a factual admission that some liability exists. SeeTomasso Bros., Inc. v. October Twenty-Four, Inc., 221 Conn. 194,199 (1992).
 III.
Judgment is rendered for the plaintiff to recover damages of $8,650.00 plus taxable costs. The amount of damages includes the basic contract price of $8,800.00 plus extras of $600.00 for moving top soil and pushing fill and $400.00 for installing leader drains for rain water, as noted in the contract. Subtracted from $8,650.00 is the sum of $1250.00 suggested by the plaintiff and found by the court to be the reasonable cost of completion. Not allowed as an item of damages is the plaintiff's charge of $360.00 for pushing and pulling cement trucks; said charge not being part of or even envisioned by the contract. Judgment is also rendered for the plaintiff on the defendants' counterclaim.
Jerrold H. Barnett, Judge